630 A.2d 903

SOUTH WHITFORD ASSOCIATES, INC.
and Blair & Sons, Inc., Appellants

v.

ZONING HEARING BOARD OF WEST
WHITELAND TOWNSHIP
(Three Cases).

Commonwealth Court of Pennsylvania.

Argued March 2, 1993.

Decided July 29, 1993.

Reargument Denied Sept. 24, 1993.

388

John C. Snyder, for appellants.

Vincent M. Pompo, for appellee.

CRAIG, President Judge, and McGINLEY, J., and KELTON, Senior Judge.

CRAIG, President Judge.

South Whitford Associates, Inc., and Blair & Sons, Inc., (hereinafter referred to individually as "Whitford" and "Blair" respectively, and jointly as "the developers"), appeal from an order of the Court of Common Pleas of Chester County affirming the decisions of the Zoning Hearing Board of West Whiteland Township (board) and the Board of Supervisors of West Whiteland Township ("supervisors" or "board of supervisors") denying the developers' substantive attack on the con-

stitutionality of the West Whiteland Township Zoning Ordinance (ordinance) and rejecting their land development application for a public use heliport and nine buildings for office and warehouse uses. We affirm in part and reverse in part.

The facts as found by the trial court are as follows. Whitford and Blair, as corporations, are under common ownership. Whitford owns a tract of land in the I–1 Limited Industrial District (I–1 district) of West Whiteland Township. On February 25, 1988, Blair filed a preliminary land development plan for improvements on Whitford's lot.

According to the plan, Blair hoped to construct nine buildings, aggregating 159,000 square feet of floor space, for commercial office and warehouse use, together with a 2,500 square-foot helicopter pad and service area to be used as a public heliport. The proposed facilities would be available for use by the public for leasing, servicing and fueling helicopters, as well as for landings and take-offs. The supervisors denied approval of the plan, however, and the developers appealed to the trial court at docket No. 88–06383.

In addition, the developers then filed a challenge to the substantive validity of the ordinance before the board. The board rejected the challenge and the developers appealed that decision to the trial court at docket No. 88–08931.

At the same time, the developers discontinued their original appeal at docket No. 88–06383 and Blair submitted two revised land development plans to the supervisors. Both plans included nine commercial office and warehouse buildings, but only one of the plans also included a public use heliport. The supervisors rejected both plans on January 3, 1989, and the developers filed appeals in the trial court at docket Nos. 89–00735 and 89–00736.

The trial court consolidated the three appeals on the stipulations of the parties and determined that neither the supervisors nor the board committed either an error of law or an abuse of discretion in denying the plan and constitutional challenge. Therefore, the trial court affirmed the decisions

and orders of the supervisors and the board, and now the developers seek relief before this court.

## SUPPLEMENTING THE RECORD

■ Initially, we will address the developers' contention that the trial court erred in refusing to supplement the record in this case with the records of the two proceedings before the supervisors that were presented by the developers in their original appeal at Docket No. 88–06383, the one which the developers later withdrew. They argue that the record filed in the original appeal contains information involving allegedly inconsistent actions of the supervisors in first granting the developers a conditional use to build on areas of "precautionary slope," [1] and the supervisors' later actions in rejecting the land development application, in part, because the construction previously approved for the conditional use was then held to be improper. The alleged inconsistency, the developers suggest, is both an error of law and an abuse of discretion on the part of the supervisors. Refusing to supplement the record, they argue, is reversible error on the part of the trial court.

Our review of the record reveals that, in two opinions, the trial court offered different reasons for refusing to supplement the record. One trial judge issued the original decision dated May 27, 1992, and docketed on May 28. The developers filed a notice of appeal and the Court of Common Pleas for Chester County filed two per curiam praecipes transferring the case to two trial judges for clarification. Ultimately the case ended up before a second judge, who filed a supplemental opinion on August 13, 1992.

In the May 27 decision, the trial court stated that the issue of supplementing the record had been decided earlier. "This Court previously ordered that the record of Appellant's discontinued appeal docketed at No. 88–06383 would not be included in the record of the present appeals."

1. This term and the issues surrounding it are discussed more fully below.

However, we cannot find any evidence of the trial court's previous order. The docket for this case, in pertinent part, shows the following entries:

8. December 29, 1987:MEMORANDUM BY APPELLANTS MOTION TO CONSOLIDATE & SUPPLEMENT THE RECORD BY APPELLANT PRAECIPE FOR DETERMINATION BY APPELLANTS CERT/SVC.

9. January 16, 1990: ANSWER TO MOTION TO CONSOLIDATE AND SUPPLEMENT THE RECORD BY APPELLEE CERT. OF SERVICE

9a. January 16, 1990: MEMORANDUM BY APPELLEE C/S

10. March 2, 1990: BRIEF BY APPELLEE—INTERVENOR WEST WHITELAND TWP. C/S

11. May 28, 1992: OPINION AND ORDER OF 5/27/92 BY JOYNER, J. COPIES SENT

Before the May 28, 1992 docket entry, there is no entry for an order responsive to the appellants' December 29, 1987 motion. Therefore, the trial court's statement that the question had been previously addressed is not supported by the record.

In a supplemental opinion dated August 13, 1992, the trial court clarified the May 27 opinion with the following explanation:

With respect to Appellant's Motion to Supplement the record, that motion was filed on December 29, 1989. On January 16, 1990, Appellees filed their memorandum contra to that motion. Argument was held on March 2, 1990. Until Appellant filed their statement of matters complained of on appeal on July 31, 1992, nothing further was done by either party or this Court in reference to the request to supplement the record. Once the total record was before the Court for argument without a decision made on supplementing the record, this Court treated that motion as waived.

Again, there is nothing in the record to suggest that the parties intended to waive the question of supplementing the

record. Therefore, this explanation by the trial court is also unsupported by the record.

Nonetheless, we agree that the trial court acted properly in not supplementing the record. The fact that the supervisors had previously granted conditional use approval to the developers does not enable the trial court or this court to take judicial notice of the record from that proceeding in reviewing the record of a different proceeding regarding a land development application. In deciding whether the supervisors erred in rejecting the developers' land development plans, the trial court is limited to reviewing the materials that were before the supervisors in the land development proceeding. Therefore, the developers should have asked the *supervisors* to incorporate any transcripts in existence from the conditional use proceedings into the record of the revised land development applications process. Only then could the trial court have properly considered the record of the conditional use application.

In addition, although § 1005-A of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 11005-A, (MPC), grants trial courts discretion to receive additional evidence in appeals from decisions of zoning boards and governing bodies, that section of the MPC is not applicable to this case. Section 1005-A concerns taking evidence in the form of additional testimony or exhibits. However, we are asked to decide whether the trial court erred, not in refusing new testimony, but in failing to take judicial notice of the record of two earlier proceedings before the supervisors in considering the developers' present appeals.

Accordingly, all references in the developers' brief to the aborted appeal are not properly a part of the record in this case, and we will not consider those alleged facts in our discussion of the following arguments.

■ The remaining arguments concern zoning decision appeals where the trial court did not take additional evidence. Our scope of review in these cases is limited. We may only determine whether the board or the supervisors committed a

manifest abuse of discretion or an error of law. *Mill Valley Associates v. Zoning Hearing Board of Tredyffrin Township,* 126 Pa.Commonwealth Ct. 340, 559 A.2d 985 (1989).

### HELIPORTS AS AN EXCLUDED USE

The developers argue that the ordinance is not constitutional because it excludes a legitimate use—heliports—from all of West Whiteland Township. Ordinarily, a substantive challenge to a zoning ordinance's presumed validity initiates a series of shifting burdens of proof. A petitioning party must prove that the use is totally excluded and that the use is a legitimate one. At this point the ordinance is presumed unconstitutional. The municipality must then show that it has a rational basis for excluding the use to protect the general health, safety, morals and welfare of its citizens. *Beaver Gasoline Company v. Osborne Borough,* 445 Pa. 571, 285 A.2d 501 (1971).

In this case, the parties agree, for the purposes of the exclusionary zoning argument, that heliports are totally excluded from West Whiteland Township. However, for purposes of the developers' challenge to the supervisors' denial of the land development plan, the developers argue that the ordinance permits heliports. After a review of the ordinance, we conclude that the ordinance totally excludes heliports.

The ordinance before us is unusual among modern zoning codes in that it provides both lists of prohibited uses and lists of permitted uses. Heliports are not included in either type of list. The parties have not supplied us with any case law exploring how we should interpret a zoning ordinance that enumerates both prohibited and permitted uses. Nor are we aware of any such cases. Therefore, because a zoning ordinance listing of permitted uses logically implies that the non-listed uses are not allowed, we hold that the list of permitted uses will be deemed to be exhaustive—and therefore determinative—as to what is allowed, and a list of prohibited uses in the same ordinance will *not* be taken as an exhaustive listing of what is prohibited. Accordingly, because

heliports are not specifically enumerated on any list of permitted uses, the conclusion must be that heliports are not permitted in West Whiteland Township.

■ This court has previously held that a heliport constitutes a use which is inherently objectionable and not a legitimate land use. *Appeal of Green & White Copter, Inc.,* 25 Pa.Commonwealth Ct. 445, 360 A.2d 283 (1976). Therefore, excluding heliports is prima facie an acceptable use of the police power which does not automatically render the ordinance invalid. *Bluebell Associates v. Township Engineer of Whitpain Township,* 45 Pa.Commonwealth Ct. 599, 405 A.2d 1070 (1979).

However, the developers argue that *Green & White Copter* must be interpreted narrowly. In that case, the developers suggest, this court upheld the municipality-wide exclusion of heliports because the facility in question was located in an R–2 residential district. The developers contend that the limited industrial district in our case is a more appropriate district for a heliport than an R–2 residential district. Therefore, they ask us to limit the application of the *Green & White Copter* rule to its particular facts.

The question before this court, however, is not whether I–1 districts are better locations for heliports than R–2 districts. The question is whether, in the entire municipality, heliports are a legitimate use. In *Green & White Copter* this court concluded that "heliports, *particularly* in residential areas, embody a land use, the *total exclusion* of which appears *prima facie* to be designed to protect the public interest." *Id.* 25 Pa.Commonwealth Ct. at 450, 360 A.2d at 285 (emphasis added). In *Bluebell,* this court further noted that "Green & White Copter ... presents a clear basis for concluding that the total exclusion of substantial aviation facilities ... *from a largely residential township,* can be accomplished without loss of the presumption of validity." *Bluebell,* 45 Pa.Commonwealth Ct. at 608, 405 A.2d at 1070 (emphasis added). Therefore, our analysis must focus on West Whiteland Township as

a whole and its land uses rather than the particular zoning district in which the heliport is proposed.

In the case before us, the board found that "West Whiteland Township is primarily a residential community with sixty-four percent (64%) of the assessed real estate values of the Township consisting of residential uses." In a footnote, the developers question the relevance of the evidence relied upon by the board, which consisted mostly of records of assessed property values. They suggest that the ratio of residential dollars to non-residential dollars is not an accurate indication of West Whiteland Township's residential character. In addition, the developers note that the current land uses in West Whiteland Township, which determine the assessed value of properties, are subject to change.

However, these assertions merely attack the weight of the evidence presented. The developers did not present any evidence to rebut the residential character of the municipality. Therefore, the board did not err in finding that West Whiteland Township is a residential township.

Furthermore, the board found that the developers' proposed heliport facility would cause significant disturbances to other landowners. Specifically, the board made the following pertinent findings of fact:

13. During lift-off and landing, the types of helicopters which would be using this proposed heliport generate sound levels in the 90–91 decibel range.

14. The Applicant does not propose to erect or construct sound-attenuating barriers around the perimeter of the property.

15. If a helicopter would take off from the helipad ... and travel to the west as it gained altitude, when that helicopter reached the western end of the property, the noise level at the south, north and west property lines, would be in excess of 70 decibels.

16. Section 912.5 of the Zoning Ordinance prohibits uses which generate noise levels in excess of 70 decibels at the

property line of the property on which the use is being conducted.

17. Section 703.3(m) prohibits uses which cause noise, either sustained or sporadic, which exceeds the level of ordinary conversation at the boundaries of the lot on which it is conducted.

. . . .

19. Public heliports are not a permitted use in an I–1 district or in any district under the Zoning Ordinance.

. . . .

24. Residents living in the area of Keystone Helicopter [a lawful, non-conforming use heliport located in West Whiteland Township] appeared at the hearing and testified that during take-offs and landings, the noise and vibration creates offensive conditions to them at their homes, some of which are as far as eighteen hundred (1800) feet from the Keystone property.

. . . .

29. The Applicant's proposed use would, by its very nature, disturb the tranquility and peaceful use of the surrounding residential properties by virtue of the noise inherent in the operation of helicopters, especially the take-off and landing of same.

The board went on to reach the following conclusions:

5. A public use heliport located on the Applicant's property would disturb the tranquility of a large area of [West Whiteland Township] and would have deleterious effects upon the general public.

6. A public use heliport located on the Applicant's property would unreasonably impinge upon the rights of neighboring landowners in the use and enjoyment of their properties.

. . . .

8. The Applicant's proposed use is not a legitimate use in that the proposed use would disturb the tranquility of a large area of [West Whiteland Township] by virtue of the noise associated with the use.

9. Given the existence of a public use heliport in West Whiteland Township [Keystone Helicopter] and the adverse effect that the Applicant's proposed public use heliport would have upon the residents immediately surrounding the Applicant's proposed facility, the total exclusion of public use heliports from all portions of [West Whiteland Township] is justified, and the failure to include such a use does not raise a presumption of invalidity or, if such a presumption [is] raised, justifies the exclusion.

. . . .

11. The total exclusion of additional public use heliport facilities in West Whiteland Township is justified by the facts existing in this case and by the applicable law.

The developers contend that the board should not have considered the presence of an existing heliport, i.e., Keystone Helicopter, as grounds for rejecting their proposed heliport. However, to the extent that the evidence regarding Keystone Helicopter sheds light on whether the developers' proposed heliport might disturb other landowners, it is a proper consideration for the board. Because the board's finding of fact No. 24, above, indicates the type of disturbance that a heliport can create, the board did not err in considering the evidence regarding Keystone Helicopter.

Thus, the board had ample reason to deny the developers' substantive challenge to the ordinance. The developers have not proved that their proposed heliport facility will not disturb other landowners' rights to enjoy the use of their property. Therefore, the developers have not rebutted the *prima facie* presumption of validity that attaches to an ordinance that totally excludes heliports. Accordingly, the trial court properly upheld the board's rejection of the developers' constitutional attack on the ordinance's failure to allow heliports, and properly affirmed the rejection of the plan which proposed a heliport.

## DETAILED REQUIREMENTS

The developers also argue that the supervisors erred by rejecting the alternate plan—without the heliport—for several

detailed violations of the ordinance and the West Whiteland Township Subdivision and Land Development Ordinance (subdivision ordinance). The developers refer to these points as "technical" violations, in the sense that the developers contend they are already in compliance with the applicable ordinance sections or they are very near to complying.

## *Refuse*

■ At the outset, the developers contend that the supervisors erred in finding the plan in violation of the ordinance and of the subdivision ordinance for failing either to provide for outdoor storage facilities for rubbish, or to provide notations indicating the developers' intention to store the rubbish indoors. We agree with the developers.

The board of supervisors relies upon all of the following sections of the ordinance to support its disapproval as to these refuse storage design matters:

§ 906.1 All rubbish and substances, whether organic or inorganic, shall be stored in suitable containers and properly disposed of as soon as is practical. All garbage-like materials shall be contained in vermin-proof containers.

§ 906.2 Except for single-family and two-family dwellings, all incidental storage shall comply with the following:

a. All storage shall be buffered in accordance with § 904.6.

b. Outdoor storage facilities for fuel, raw materials and products shall be enclosed with an approved safety fence compatible with the architectural and landscaping style employed on the lot. In addition to a fence, bulk storage tanks shall be enclosed by a moat or berm to contain potential spillage.

c. Outdoor storage of raw materials and/or finished products shall be permitted only within the buildable area of the lot and shall not exceed ten feet (10') in height.

§ 904.5 An effective buffer may be accomplished through use of any one or combination of the following:

a. Existing natural or man-made barriers such as fences and walls, when architecturally compatible with the landscaping and architectural style or uses in Column Y [requires buffering of outdoor storage in industrial zones abutting existing residential use or zones].

b. Proposed grading of land to create mounding, berms or depressions that block visibility.

c. Proposed planting of trees and shrubs in accordance with the following conditions. . . .

§ 904.6 All mechanical equipment, loading and storage not enclosed in a building shall be fully and completely screened from view from any adjacent streets or residential districts or uses, through the use of measures indicated in § 904.5, and in a manner compatible with the architectural and landscaping style employed on the lot. Such screening shall be subject to site plan and/or architectural review by the Township.

In addition, the board of supervisors calls our attention to subdivision ordinance §§ 302.3.N(2) and 302.3.R, which follow:

§ 302.3.N(2) Plans for the design and location of adequate surface and storm drainage. Such plans shall incorporate the following ... All proposed earthmoving and grading, as well as stabilization and site restoration measures.

§ 302.3.R A preliminary land development plan in addition to the aforementioned items A through R as applicable, shall show proposed building locations, location and size of parking lots, provisions for landscaping and lighting of site, shade tree locations, etc.

However, we find no language in these provisions that either prohibits indoor storage of rubbish or imposes an obligation to include notations indicating an intention to do so. The board of supervisors also asserts that plans to store rubbish indoors for nine buildings are impractical. However, this assertion is irrelevant if there are no regulations to that effect. Therefore, we must reverse the trial court regarding these specific questions because the supervisors erred as a matter of law.

*Pedestrian Trails*

■ The developers also assert that the supervisors erred in finding the plan in violation of § 908.4.a(1) of the ordinance and § 302.3.N(2) of the subdivision ordinance, quoted above, for failure to provide for the extension of the preexisting pedestrian trail system, and for failing to indicate how such a trail will be constructed. The ordinance provides the following requirements:

§ 908.4. Pedestrian Circulation—The following regulations shall apply to all uses, including single-family and two-family dwellings, as applicable.

a. The developer shall preserve existing trails or install trails and pathways or other pedestrian facilities as necessary and desirable to achieve the following:

(i) Logically continue, link or expand existing pedestrian facilities on, across and abutting the site, including the informal trails network identified on Map # 18 of the 1982 West Whiteland Open Space and Recreation Study.

The developers note that Blair's development plans show a trail pursuant to the ordinance. Our review of the plans indicates that the plan contains a notation indicating the presence of an "informal trail network" directly south of the historic district on the lot.

Although the appellant's plan may satisfy § 908.4.a(i) of the ordinance by noting the existence of an informal trail across the lot, it does not satisfy § 302.3.N(2) of the subdivision ordinance which, as quoted above, calls for specifying the type of earthmoving and grading that the developers may have to perform in extending the trail. Therefore, the supervisors did not err in finding the plan in violation of §§ 302.3.N(2).

*Certification*

■ The developers further contend that the supervisors erred in concluding that the plan must be rejected because the developers failed to submit a certification statement on a form provided by West Whiteland Township as required by § 702.3 of the ordinance. The ordinance specifically requires that

"[a]ll uses shall comply to this section and the Physical Performance Standards of § 912, and as promulgated on a form provided by the Township, certification or affidavit that the following design standards are to be conformed to by all uses in this district."

The developers note, however, that the plan did contain the following language in the upper right hand corner of the first page. *"ENGINEERS CERTIFICATION:* These plans have been prepared in conformance with zoning, building, sanitation and other applicable Township Ordinances and Regulations."

The ordinance requires the developers to use a form provided by West Whiteland Township. The supervisors and the board believe that the certification guarantees that future uses will comply with the zoning ordinance. However, the certification form cannot create any type of covenant running with the land, particularly when the certification is merely part of a *preliminary* land development plan. The zoning ordinance itself provides the municipality with the power to issue cease and desist orders in the event that a future use violates the ordinance.

Whatever the reason for certifying the plan, by itself, failure to use West Whiteland Township's form would not constitute sufficient grounds for rejecting the plan. However, in light of the fact that the developers' development plan suffers from fatal flaws, which will be described in the following sections, the supervisors' rejection of the plan specifically because of the developers' failure to use West Whiteland Township's certification form is, at worst, harmless error.

### Other Plan Details

The last arguments raised by the developers regarding detailed ordinance violations contend that the supervisors erred in finding that the plans violate ordinance provisions regarding the design of access aisles and drives, the accessibility of off-street loading, the width of sidewalks abutting parking spaces, and the length of cul-de-sacs.

These questions would normally warrant further fact finding. However, because of our conclusions regarding the number of buildings permitted per lot and the area of impervious surface on precautionary slopes (below), the resolution of these questions, even if in the developers' favor, would nonetheless result in a rejection of the plan as it is written. Therefore, there is no need to remand for reconsideration of the issues of loading accessibility, sidewalk widths and cul-de-sac lengths.

### NUMBER OF BUILDINGS ALLOWED ON A LOT

As foreshadowed above, we must nonetheless affirm the supervisors on the following issues and therefore affirm its rejection of the developers' land development plan. The supervisors rejected Blair's plan, in part, because Blair proposed constructing nine buildings on Whitford's lot. The supervisors, relying on the first sentence of § 702.1 of the ordinance, found that only one building may be constructed on a lot in the I–1 district. The developers contest the supervisors' interpretation of the ordinance as being an error of law because it is overly restrictive.

The disputed language of § 702.1 is as follows: "A single building may be erected, altered or used and a lot may be used for any one or more of the following purposes...." The developers suggest that this language permits them to construct more than a single building on a single lot because several of the enumerated permitted uses are included in the plural form, and because the ordinance allows multiple uses on the same lot. Therefore, they argue, when read as a whole, the words "a single building" do not actually restrict development to one building per lot.

The developers assert that the supervisors' interpretation of § 702.1 is "particularly illogical" in light of the ordinance definition of "industrial park", which is a permitted use in the I–1 district. The developers suggest that the industrial park definition indicates that more than one building can be constructed on a single lot. The pertinent language is as follows: "An industrial park is a tract of land, the development of

which is vested in a single body, *that has been platted to provide for three (3) or more industrial sites* with special emphasis given to aesthetics and compatibility of uses within the tract." § 704 (emphasis added).

However, the developer's land development proposal did not gain approval as an industrial park. In addition, the use of the word "platted" in the definition implies that an industrial park must nonetheless be divided into separate lots. (The developer's unique argument that industrial parks are merely one of the "one or more" uses that may be placed on a lot in the I–1 district, suggesting that, perhaps, more than a single industrial park could be placed on a single lot, reveals the reason that industrial parks logically should be required to be subdivided.) Therefore, the availability of an industrial park in the I–1 district does not help the developers because the developers did not seek approval of an industrial park development, and because the industrial park must be subdivided in order to permit multiple buildings.

The developers also argue that the ordinance and the subdivision ordinance contain definitions of "land development" that permit the construction of more than one building on a lot. The ordinance defines land development at § 210 as follows:

*The improvement of one lot* or two or more contiguous lots, tracts or parcels of land *for any purpose involving: (1) a group of two or more residential or nonresidential buildings,* whether proposed initially or cumulatively, or a single nonresidential building on a lot or lots regardless of the number of occupants or tenure.... (Emphasis added.)

In addition, the subdivision ordinance defines land development at § 104 as follows:

A. *[T]he improvement of one (1) lot* or two (2) or more contiguous lots, tracts or parcels or land *for any purpose involving:*

(1) a single building ... [or] *a group of two (2) or more buildings*.... (Emphasis added.)

These provisions are drawn from the MPC definition of land development, which permits construction of multiple buildings on a single lot. Section 107 of the MPC, 53 P.S. § 10107. However, despite the similarity with the MPC definition there are no provisions in either the ordinance or the subdivision ordinance implementing the definition provided in the MPC for West Whiteland Township.

To the contrary, the ordinance specifically limits lots to a single principal building. The definition of "lot" states that a lot is "[a] parcel of land ... occupied, or is to be occupied, by *one (1) principal building or use* together with permitted accessory buildings or uses, *except where otherwise expressly provided in this Ordinance.*" § 201 (emphasis added). The disputed language of § 701.2 does not expressly provide for more than a single building on a lot. Therefore, the board of supervisors did not err or abuse its discretion in rejecting the developers' development plans for proposing nine buildings on the lot.

## PRECAUTIONARY SLOPE

 The developers also argue that the supervisors erred in interpreting the zoning ordinance's provisions restricting the amount of impervious surface coverage allowed on areas of "precautionary slope". The ordinance defines precautionary slope at § 1202.1.b as follows:

> Precautionary slopes are those of fifteen (15) to twenty-five (25) percent slope on the United States Geological Survey Topographic Maps of the Regional Base Map Series of 1975 for the Downingtown, Malvern, Unionville, and West Chester Quadrangles, (e.g., sloping fifteen (15) to twenty-five (25) feet vertical over a distance of one hundred (100) feet horizontal).

The ordinance provision in question, § 1203.3.c, states:

> On any lot containing an area or areas of precautionary slope, the total amount of impervious surface that may be installed or maintained *within the total area or areas of precautionary slope* shall not exceed fifty percent (50%) of

the *maximum amount of impervious surface permitted* on any lot in the underlying base zoning district. (Emphasis added.)

The issue before us is whether the language "maximum amount of impervious surface permitted" must be interpreted to refer to "number of area units (square feet, etc.) of impervious surface permitted" or "percentage of impervious surface permitted". The developers argue that "amount" means "amount of area units in the specific development". Therefore, they suggest that this language permits them to position up to 50 percent of the maximum allowable impervious surface area, as determined with reference to this specific underlying lot, on areas of precautionary slope.

In this case, the I–1 district provision permits 75 percent of a lot to be covered by impervious surfaces. The size of the lot owned by Whitford is approximately 17.75 acres. Seventy-five percent of that lot equals 579,892.50 square feet[2]. Therefore, the developers believe that they may position impervious surface *on the precautionary slope area* to the extent of 50 percent of the 579,892.50 square foot amount, or 289,946.25 square feet. Because the planned development proposes to cover only 10,270 square feet of precautionary slope with impervious surface, they feel that their plans necessarily fall within the requirements of § 1203.3.c.

As the developers' argument illustrates, if the overall lot is large enough, fifty percent of the maximum coverage allowed in that lot's zoning district may constitute an impervious area far greater than the total area of precautionary slope on the lot. According to the developers' interpretation of § 1203.3.c, in such cases the entire area of precautionary slope can be covered with impervious surface.

However, the board of supervisors insist that § 1203.3.c must be interpreted to limit impervious surface coverage on precautionary slopes to 50 percent of the *percentage* of maximum impervious surface cover allowed in the underlying

2. The numbers of square feet and the calculations have been supplied by the developers.

zoning district generally. As mentioned above, 75 percent impervious cover is allowed in the I–1 district. Therefore, the board of supervisors assert that 50 percent of 75 percent, i.e., 37.5 percent, *of the area of precautionary slope* on Whiteland's lot may be covered with impervious surfaces.

We agree with the supervisors' interpretation because it is in accord with the ordinance's stated purposes for limiting development on areas of precautionary slope. Article 12 of the ordinance sets forth the regulations applicable to the steep slope conservation district, and § 1200 lists the following purposes for that district:

§ 1200.1 To promote the public health, safety and welfare by the protection of steep slope areas and by encouraging the retention of open space located and designed so as to constitute a harmonious and appropriate part of the physical development of West Whiteland Township.

§ 1200.2 To permit only those uses of steep slope areas which are compatible with the conservation of natural conditions and which maintain stable soil conditions by: (a) minimizing disturbances to vegetative ground covers; and (b) restricting the regrading of steep slope areas.

§ 1200.3 To limit soil erosion and the resultant destruction of the land, siltation of streams, and damage to the property of individuals.

§ 1200.4 To protect low-lying areas from flooding by limiting the increase in stormwater runoff caused by grading of slopes areas, changes of ground cover, or the erection of structures.

§ 1200.5 To maintain the ecological integrity and habitat value of steeply sloped areas, i.e., indigenous vegetation and wildlife, which could be adversely affected by otherwise permitted disturbances.

§ 1200.6 To allow the continuing replenishment of ground resources and the maintenance of springs.

The supervisors' interpretation of § 1203.3.c will insure proportionately *less* impervious coverage on precautionary slopes and prevent owners from constructing impervious cov-

erage over the *total* area of precautionary slope within a lot, whereas the developers' interpretation would be likely to allow complete coverage of areas of precautionary slope, depending upon that area's size relative to that of the total lot. The developers' interpretation of § 1203.3.c is therefore in conflict with the stated purposes for Article 12 which is intended to limit construction on precautionary slopes to a lesser extent than construction on level land.

The supervisors found that 10,270 square feet of precautionary slope that the developers propose to cover on the lot is nearly 100 percent of the lot's total area of precautionary slope. "Certain areas of Precautionary Slope ... in and around the building proposed to contain 11,400 square feet of floor area, are depicted to be developed with impervious coverage well in excess of the regulatory thirty-seven and one-half (37.5%) percent maximum; thereby violating Zoning Ordinance § 1203.3(c)." Although the record does not contain any reference to the total area of precautionary slope on the lot which would allow us to determine whether the developers' impervious coverage exceeds 37.5 percent, the developers have never challenged this factual finding of the supervisors. Therefore, the board of supervisors did not err as a matter of law, nor did it abuse its discretion, in concluding that the developers' plan as written violates § 1203.3.c.

Accordingly, although the supervisors erred regarding the indoor storage of rubbish, we ultimately conclude that the supervisors did not err in rejecting the developers' preliminary land development plans.

This case was argued before a panel consisting of President Judge Craig, Judge McGinley and Senior Judge Wright. Because of Senior Judge Wright's death, the briefs have been submitted to Senior Judge Kelton for his consideration as a member of the panel.

## ORDER

NOW, July 29, 1993, the order of the Court of Common Pleas of Chester County, dated May 27, 1992, Nos. 88–08931,

89–00735, 89–00736, is affirmed insofar as it holds the West Whiteland Township Zoning Ordinance constitutionally valid; affirmed insofar as it holds that heliports are an excluded use under the West Whiteland Township Zoning Ordinance; affirmed insofar as it holds that the above named appellants violated §§ 702.1, 702.3, and 1203.3.c of the West Whiteland Township Zoning Ordinance and § 302.3.N(2) of the West Whiteland Township Subdivision and Land Development Ordinance; and reversed insofar as it holds that the above named appellants violated the West Whiteland Township Zoning Ordinance and the West Whiteland Township Subdivision and Land Development Ordinance regarding rubbish storage.