**MAJ ENTERTAINMENT,
INC., Appellant**

v.

**ZONING BOARD OF ADJUSTMENT
OF the CITY OF PHILADELPHIA
and The City of Philadelphia.**

Commonwealth Court of Pennsylvania.

Argued March 12, 2008.
Decided May 2, 2008.

Kenneth A. Young, Philadelphia, for appellant.

Cheryl L. Gaston, Philadelphia, for appellee, City of Philadelphia.

BEFORE: LEADBETTER, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge COHN JUBELIRER.

MAJ Entertainment, Inc. (MAJ) appeals from an order of the Court of Common Pleas of the First Judicial District of Pennsylvania (trial court) affirming the decision of the Philadelphia Zoning Board of Adjustment (Board), which denied MAJ's appeal from a Cease Operations Order (Order to Cease) issued by the Philadelphia Department of Licenses and Inspections (L & I) on MAJ's property at 712–714 South Street in Philadelphia (Property). MAJ argues that the Board erred in finding that it did not have a vested right in a Permit for Use Registration issued to it by L & I on July 11, 2000 (2000 Permit)

and that its operation of a club providing space for patrons to engage in sexual activity was not permitted by the 2000 Permit.

The Property is located in a C–2 commercial district. Prior to MAJ's ownership, the Property had been occupied by a restaurant called Señor Rattler's. Señor Rattler's had operated under the provisos of a variance[1] issued in 1988 (1988 Provisos), which restricted the use of the Property. The 1988 Provisos stipulated, among other things: that Señor Rattler's would not provide live entertainment; that there would not be a dance floor on the Property; and that Señor Rattler's and its owner would not seek a license to operate as a club. In 2000, after MAJ had acquired the Property, MAJ sought and received a use permit to operate a restaurant with accessory "live entertainment and dancing by patrons...." (2000 Permit.) MAJ opened an establishment called Club Kama Sutra on the Property. Club Kama Sutra offered buffet dining on the first floor, DJ music and dancing on the third floor, and open cubicles with futon mattresses where patrons could engage in sexual activity, as well as watch other patrons so engaged, on the second floor. In 2005, L & I issued an Order to Cease, effective November 13, 2005, directing MAJ to cease operating a restaurant not in accordance with its permit, to cease operating a sex club without a permit, and to cease operating a private club without a permit.

MAJ appealed the Order to Cease and received a hearing before the Board. The Board concluded that the 1988 Provisos ran with the land and, therefore, bound MAJ as well. The Board also concluded that permitting patrons to engage in sexu-

---

1. This variance allowed for two one-story additions, a fire stairway to the third floor, and the installation of a dumbwaiter.

al activity was not an accessory use to a restaurant. The Board, therefore, denied MAJ's appeal. MAJ appealed the Board's decision to the trial court. Without taking additional evidence, the trial court issued an order affirming the decision of the Board. In its opinion, issued pursuant to Pa. R.A.P.1925, the trial court held that the 1988 Provisos were in effect and, even if they were not, MAJ was not using the Property in compliance with the 2000 Permit. In response to arguments by MAJ, the trial court also held that simply because Philadelphia's zoning ordinances [2] do not specifically prohibit sex clubs does not mean that they are permitted. Finally, the trial court agreed with the Board's determination that the use of the Property for the sexual activity of patrons was not an accessory use to the Property's use as a restaurant.

■■■ MAJ now appeals to this Court.[3] MAJ presents three main arguments for our consideration: 1) the sexual activity taking place on the Property was an accessory use to the Property's use as a restaurant and Club Kama Sutra was, therefore, operating in compliance with the 2000 Permit; 2) because MAJ was using the Property in compliance with the 2000 Permit, and because MAJ relied on the 2000 Permit, it has a vested right in the 2000 Permit; and 3) MAJ should be allowed to continue using the Property as it has been because nothing in Philadelphia's zoning ordinances explicitly prohibits the activity that has been taking place there. We will discuss each of these arguments in turn.

■■ First, MAJ argues that its use of the Property as a venue where its patrons may engage in sexual activity with one another and view one another engaging in sexual activity is "live entertainment," an accessory use, allowed by the 2000 Permit, to the Property's use as a restaurant. Section 14–102(2) of the Philadelphia Code defines an accessory use as "[a] use, including all necessary public utility facilities, subordinate to and on the same lot as the main use on a lot and customarily incidental to the main use...." Philadelphia Code § 14–102(2). In *Southco, Inc. v. Concord Township*, 552 Pa. 66, 713 A.2d 607 (1998), the Supreme Court of Pennsylvania interpreted substantially similar language in the zoning ordinance of Concord Township and concluded that off-track betting was an accessory use to a restaurant. MAJ argues that patrons' sexual activity is just as much an accessory use to a restaurant as is gambling, even though, like gambling, it may strike some as an unusual addition to the dining experience and may be found by some to be morally objectionable. This argument fails on several points.

Assuming Club Kama Sutra was a restaurant, MAJ's claim that providing space for patrons to engage in sexual activity was an accessory use to the primary restaurant use would fail. MAJ relies heavily on the Supreme Court's decision in *Southco*, which interpreted language similar to that in Section 14–102(2), defining "accessory use." This reliance is misplaced. In *Southco*, applicants Greenwood Racing,

---

**2.** Philadelphia Code §§ 14–101 to 14–2109.

**3.** In a zoning matter in which the trial court has taken no additional evidence, "this Court's review is limited to determining whether the zoning board abused its discretion or committed an error of law." *Arter v. Philadelphia Zoning Board of Adjustment*, 916 A.2d 1222, 1226 n. 9 (Pa.Cmwlth.2007). However, whether a use falls within a catego-ry described in a zoning ordinance is a matter of law, which an appellate court may determine based on evidence in the record. *Diversified Health Assocs. v. Zoning Hearing Board of the Borough of Norristown*, 781 A.2d 244, 247 (Pa.Cmwlth.2001) (citing *Merry v. Zoning Board of Adjustment*, 406 Pa. 393, 395, 178 A.2d 595, 597 (1962)).

Inc. and Brandywine Turf Club, Inc. wished to open a "Turf Club" restaurant with appurtenant off-track betting. *Southco,* 552 Pa. at 69, 713 A.2d at 608. The Concord Township Zoning Ordinance did not explicitly allow gambling facilities, but did allow accessory uses, which it defined as "a use conducted on the same lot as, and subordinate to, a principal use to which it is related (which use is clearly incidental to and customarily found) in connection with a particular principal use." *Southco,* 552 Pa. at 74, 713 A.2d at 611 (quoting Section 104 of the Concord Township Zoning Ordinance.) The Supreme Court held that wagering fit into this definition of accessory use as it was both subordinate to and customary and incidental to the Turf Club's primary use as a restaurant. The Court found the wagering was subordinate to the restaurant use for the following reasons: 75% of the building space was devoted to the restaurant use, while only 25% was devoted to the off-track betting; the majority of the employees were devoted to the restaurant use; and, most importantly, the Race Horse Industry Reform Act, 4 P.S. §§ 325.101–.402, provided that off-track wagering was only permitted at facilities incorporating high-end restaurants. With regard to this last point, the Court stated "the [Race Horse Industry Reform] Act itself demonstrates that the wagering aspect of the Turf Club is dependent on, and subordinate to, the restaurant, since the Act clearly does not envision or permit a facility allowing wagering to exist without a restaurant such as that proposed by the Applicants." *Id.* at 75, 713 A.2d at 611.

The Race Horse Industry Reform Act was also central to the Court's determination that off-track wagering was a use "customarily incidental" to a restaurant: "state regulations envision the wagering component of a Turf Club like that proposed by Applicants as being customarily incidental to a restaurant since the regulations will not allow approval of such a facility without a restaurant." *Id.* at 76, 713 A.2d at 612.

Here, the use of the Property as a club at which people may meet and engage in sexual activity does not appear to be subordinate to the facility's use as a restaurant and is not customarily incidental to that use. Club Kama Sutra's visitors seem to have paid primarily for access to the "party" rather than for the buffet.[4] At the hearing before the Board, Alan Tizer, president of MAJ, when asked whether the club sold any sexual devices, replied, "No. The only thing we charge money for is the dinner and dessert buffet, *which is included in the price of admission to attend the parties.*" (Board Hr'g Tr. at 17 (emphasis added).) This statement begins with the assertion that the price charged is for the food, but ends with the concession that the price is for admission and that the food is included. This interpretation is further supported by the price structure of Kama Sutra's admission charge, which seems wholly unrelated to the amount of food a patron might consume:

Mr. Auspitz [Board member]: How much do they charge for this?

Mr. Tizer: The charge for a couple to attend on a Saturday night is $100. A couple—a couple for a Friday night is

---

4. As the Supreme Court noted in *Southco,* "the manner in which an establishment derives its income is not determinative of the establishment's principal use." *Southco,* 552 Pa. at 73, 713 A.2d at 610. The Court gave the example of a newspaper, which does not "lose its character as a newspaper" merely because it derives most of its revenue from the sale of advertising rather than sales of copies of the paper. *Id.* at 73 n. 6, 713 A.2d at 610 n. 6. We would note, however, that most people buy the newspaper for the news, not the ads.

$75 a couple. The cost for a single lady to attend is $25, and a single gentleman, and they can only attend on Friday night, is $100 charge.

(Board Hr'g Tr. at 17.) This pricing structure seems geared more toward maintaining a felicitous gender balance for the operation of a swingers' club [5] than to the operation of a restaurant. It is therefore highly questionable whether the Property's use as a club was subordinate to its use as a restaurant.

However, the use of the Property as a venue for its patrons to engage in sexual activity is certainly not customary and incidental to its use as a restaurant. MAJ bore the burden of proving that the use of the Property for patrons' sexual activity was an accessory use to the Property's use as a restaurant. *See Smith v. Zoning Hearing Board of Conewago Township,* 713 A.2d 1210, 1213–14 (Pa.Cmwlth.1998) (holding that owners of an airport failed to meet their burden of showing that their skydiving business was an accessory use to the airport). In attempting to meet this burden, MAJ tries to analogize its situation to *Southco.* However, *Southco* and the current case are clearly distinguishable. MAJ attempts to rely on *Southco* for the principle that, even though a use is uncommon, or even objectionable to some, it may still be sufficiently customary to qualify as an accessory use. This is not the principle for which *Southco* stands. Central to *Southco's* holding was the Race Horse Industry Reform Act, which provided that off-track wagering facilities would only be permitted when they included high-end restaurants. In effect, this legislation *created* a custom whereby off-track wagering was associated with fine dining. Currently, we are aware of no such legislation associating semi-public sexual activity with haute cuisine. Therefore, we must decline MAJ's invitation to effectively read the word "customary" out of the definition of "accessory use" found at Section 14–102(2) of the Philadelphia Code. Aside from arguing that even very uncommon uses may be customary and incidental to a primary use, MAJ offered no evidence to establish that providing space for patrons' sexual activity and observation of each other's sexual activity is a use customarily incidental to a restaurant.

Moreover, the idea that sexual activity is the sort of live entertainment envisioned by the drafters of the Philadelphia Code as customarily incidental to the operation of a restaurant is belied by the definition in the Philadelphia Code of a separate use that encompasses a restaurant with live sex as entertainment: the cabaret. Philadelphia's zoning ordinances define a "cabaret" as "[a]n adult club, *restaurant,* theater, hall or similar place which features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators or similar entertainers exhibiting specified anatomical areas [6] or performing specified

---

**5.** When questioned on the reasoning for the price differential, Mr. Tizer stated:

> Mr. Tizer: The reason ladies have a less of a fee is we try to limit the—or equal the proportions of people that come to this club.
> Mr. Auspitz: You want to encourage the women.
> Mr. Staten [Board member]: That's right. So you want to encourage the women to come so they meet the men.
> Mr. Tizer: Yes sir.

(Board Hr'g Tr. at 27.)

**6.** "Specified anatomical areas" are:

> (i) Less than completely and opaquely covered;
> (.a) Human genitals, pubic region;
> (.b) Buttocks; and
> (.c) Female breasts below a point immediately above the top of the areola; and
> (ii) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

sexual activities.[7]" Philadelphia Code § 14–102(24) (footnotes and emphasis added).[8] This definition of cabaret, which combines a restaurant with entertainment in the form of sexual activity, clearly indicates that sexual activity is considered to be qualitatively different than ordinary live entertainment such as karaoke or dinner theater. If the drafters of Title 14 of the Philadelphia Code had considered sexual activity to be merely another form of live entertainment which could be an accessory use to a restaurant, there would have been no need to either define cabarets as a separate use, or to provide that a restaurant could be a cabaret.

The Board found that Club Kama Sutra's patrons' sexual activity was not an accessory use to the restaurant use and was not incidental to the restaurant use. We agree that MAJ did not meet its burden of proving that sexual activity is a use customarily associated with, or incidental to, the retail sale of food, and we cannot say that the Board capriciously disregarded competent evidence in reaching this conclusion. Additionally, we believe that the inclusion of the cabaret use in the Philadelphia Code indicates that the drafters of these zoning ordinances did not intend sexual activity to be an accessory use, as live entertainment, to a restaurant. Therefore, MAJ's use of the Property to provide space for its patrons to engage in sexual activity was not an accessory use to the Property's putative primary use as a restaurant.

■ MAJ also argues that it has a vested right in the 2000 Permit. The Board found that the 1988 Provisos ran with the land and were, therefore, effective against MAJ. MAJ has offered no argument against this holding other than to argue that it had a vested right in the 2000 Permit, which, contrary to the 1988 Provisos, permitted MAJ to provide live entertainment and a dance floor for its patrons. In support of this argument, MAJ relies on *Petrosky v. Zoning Hearing Board of the Township of Upper Chichester,* 485 Pa. 501, 402 A.2d 1385 (1979). In *Petrosky,* the Supreme Court held that, in determining whether the holder of an erroneously-issued permit has a vested right in a permit, a court should consider:

1. [the permit holder's] due diligence in attempting to comply with the law;

2. his good faith throughout the proceedings;

3. the expenditure of substantial unrecoverable funds;

4. the expiration without appeal of the period during which an appeal could have been taken from the issuance of the permit;

5. the insufficiency of the evidence to prove that individual property rights or the public health, safety or welfare would be adversely affected by the use of the permit.

*Id.* at 507, 402 A.2d at 1388.

■ This Court will not find that a permit holder has exercised due diligence and

---

Philadelphia Code § 14–1605(2)(e).

**7.** "Specified sexual activities" are:
 (i) Human genitals in a state of sexual stimulation or arousal;
 (ii) Acts of human masturbation, sexual intercourse or sodomy;
 (iii) Fondling or other erotic touching of human genitals, pubic region, buttocks or female breasts.

Philadelphia Code § 14–1605(2)(f).

**8.** For a discussion of the applicability of the definition of "cabaret" found at Section 14–102(24), see Judge Pellegrini's learned concurrence in this case, *MAJ Entertainment, Inc. v. Zoning Board of Adjustment of the City of Philadelphia,* 947 A.2d 841, 844 n. 4 (2008) (Pellegrini, J., concurring).

exhibited good faith where the holder has engaged in activities in excess of those permitted by, or contrary to, the permit granted. *See Rudolph v. Zoning Hearing Board of Cambria Township,* 839 A.2d 475, 478–80 (Pa.Cmwlth.2003); *see also Randolph Vine Assocs. v. Zoning Board of Adjustment of Philadelphia,* 132 Pa. Cmwlth. 452, 573 A.2d 255, 259 (1990) (stating that where an applicant deviates from the use approved in an erroneously granted permit, he cannot claim a vested right in that permit) (citing *Petrosky*). As discussed above, MAJ's use of the Property was not in compliance with the 2000 Permit, in which it claims a vested right. Moreover, MAJ failed to display good faith or due diligence when it failed to disclose on its permit application the use to which it intended to put the Property. *See Township of West Pikeland v. Thornton,* 106 Pa.Cmwlth. 560, 527 A.2d 174, 176 (1987) (holding that landowner did not act in good faith when he sought a permit for a garage explicitly for the storage of personal property, but used it for the storage of commercial equipment, in violation of the relevant zoning ordinance). On its application for the 2000 Permit, MAJ listed the proposed uses for the Property as: utilities and cold storage in the basement; an eat-in restaurant on the first floor; a lounge restaurant on the second floor; and a lounge with dancing by patrons and DJ entertainment on the third floor. Nowhere on its application did MAJ mention that it would be providing open cubicles, furnished with futon mattresses, in which patrons would be allowed to engage in sexual activity. This is not good faith. A

diligent attempt to comply with the law would have involved disclosing the intended use of the second floor on the application.[9] Alternately, MAJ could have applied for a cabaret permit, which would have more closely approximated the use to which it put the Property. We therefore conclude that MAJ had no vested right in the 2000 Permit.

■ Finally, MAJ argues that because no provision of the Philadelphia's zoning ordinances prohibits it from allowing its patrons to engage in sexual activity, this use should be permitted. Again, MAJ's premise is faulty. Philadelphia's zoning ordinances explicitly enumerate *permitted* uses. *See, e.g.,* Philadelphia Code § 14–303(1)–(3) (explicitly enumerating the permitted uses in a C–2 commercial district). Therefore, properties may only be used in the manners explicitly permitted by Philadelphia's zoning ordinances. *See* Philadelphia Code § 14–105(1) ("In each district only the uses specified in this Title and uses accessory and incidental thereto shall be permitted."); *see also South Whitford Assocs. v. Zoning Hearing Board of West Whiteland Township,* 157 Pa.Cmwlth. 387, 630 A.2d 903, 907 (1993) ("[B]ecause a zoning ordinance listing of permitted uses logically implies that the non-listed uses are not allowed, we hold that the list of permitted uses is deemed to be exhaustive—and therefore determinative—as to what is allowed...."); Ryan, Robert S., Pennsylvania Zoning Law and Practice § 4.2.1 ("[M]ost zoning ordinances contain a list of permitted uses that clearly is

---

9. As part of its argument that it acted diligently and in good faith, MAJ asserts that L & I was aware of MAJ's use of the property at least as early as 2001, but took no action until news stories about the activities on the Property appeared on television. We note that "mere delay in enforcement does not create a vested right to use property in violation of

zoning regulations," even where the municipality has knowledge of the violation. *Marzo v. Zoning Hearing Board of Abington Township,* 30 Pa.Cmwlth. 225, 373 A.2d 463, 465 (1977) (quoting *Lewis v. Zoning Hearing Board of Lower Gwynedd Township,* 24 Pa. Cmwlth. 574, 357 A.2d 725, 726 (1976)).

intended to be exclusive."). Therefore, merely because Philadelphia's zoning ordinances do not explicitly forbid operation of a sex club does not mean that an individual or corporation may obtain a permit for a different use and operate a sex club.

For these reasons, we affirm the order of the trial court.

### ORDER

**NOW,** May 2, 2008, the order of the Court of Common Pleas of the First Judicial District of Pennsylvania, affirming the decision of the Zoning Board of Adjustment of the City of Philadelphia, in the above-captioned matter is hereby AFFIRMED.

### CONCURRING OPINION BY Judge PELLEGRINI.

This case involves whether the MAJ Entertainment, Inc. (MAJ) occupancy permit listing the use of its premises as "a restaurant with accessory live entertainment and dancing by patrons" allows it to use the property, located in a C–2 commercial district, to permit customers to engage in sex while other customers watch. Focusing on the "restaurant" portion of the occupancy permit, the majority finds that the permit does not give MAJ the right to occupy the premises to permit customers to engage in sexual activity and others to view them because such use is not "customary and incidental to its use as a restaurant." However, the permit does allow live entertainment, and while engaging in sex in public with others watching is not what most people would consider tasteful, it still would be considered entertainment under

the regulatory scheme set forth in the Philadelphia Zoning Code. Instead, I would hold that MAJ's occupancy permit does not give it the right to occupy the premises for the aforesaid purpose because that use falls within the Philadelphia Zoning Code's definition of "cabaret," a use not permitted in a C–2 commercial district.

MAJ has a right to use the property for the use listed on its occupancy permit—"a restaurant with live entertainment and dancing by patrons." What uses are permitted are largely determined by how they are defined in what is commonly known as the Philadelphia Zoning Code under the general definition section at § 14–102.[1] Under those definitions, the use granted by the MAJ permit was that of a "night club," defined as a "use engaged in the preparation and retail sale of food and/or beverages which includes live entertainment, a disc jockey or a self-contained sound system providing music; with or without amplified sound and which may or may not provide for dancing by guests and patrons." Philadelphia Zoning Code § 14–102(80). If the entertainment is sex and the viewing of sex, though, that use is no longer a "night club" use under the Philadelphia Zoning Code, but a different use, that of a "cabaret."

A "cabaret" is defined as "an adult club, restaurant, theater, hall or similar place which features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators or similar entertainers exhibiting specified anatomical areas [2]

---

**1.** We note that Section 14–102 begins "[i]n Chapters 14–100 through 14–1800 inclusive, the following general definitions shall apply ..." What uses are permitted or not permit-ted in zoning districts are contained in those provisions.

**2.** Philadelphia Zoning Code § 14–1605(2)(e) defines "Specified anatomical areas" as:

or performing specified sexual activities.³" Philadelphia Zoning Code § 14–102(24). Entertainment featuring sex and the viewing of sex falls within this definition whether the entertainers are paid or unpaid.⁴ Because a cabaret use is not permitted in a C–2 commercial district, Philadelphia Zoning Code § 14–303, I would hold that MAJ has no right under the occupancy permit to occupy the premises so that the patrons—performers—can engage in sex while other patrons watch.

Accordingly, I concur with the majority and would affirm the trial court.

Judge LEAVITT joins.

DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. The majority holds that: (1) under the zoning code of the City of Philadelphia (City), a first-floor restaurant may not provide, as an accessory use, a second-floor location for patrons to engage in, or view, consensual, non-commercial, adult sexual activity; and (2)

(i) Less than completely and opaquely covered;
  (.a) Human genitals, pubic region;
  (.b) Buttocks; and
  (.c) Female breasts below a point immediately above the top of the areola; and
(ii) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

3. Philadelphia Code § 14–1605(2)(f) defined *"Specified sexual activities"* as:

(i) Human genitals in a state of sexual stimulation or arousal;
(ii) **Acts of human masturbation, sexual intercourse or sodomy;**
(iii) Fondling or other erotic touching of human genitals, pubic region, buttocks or female breasts.
(Emphasis added.)

4. I recognize that there is another definition of "cabaret" contained in the Philadelphia Zoning Code § 14–1605(2)(d) that requires

MAJ Entertainment, Inc. (MAJ) does not have a vested right in the permit issued to MAJ in 2000 (2000 Permit), which allowed MAJ to operate a restaurant with accessory live entertainment and dancing by patrons, provided such accessory use does not fall within any definition in section 14–1605 of the City's zoning code.¹ For the following reasons, I cannot agree.

MAJ owns a three-story building at 712–714 South Street in the City (the Property). In November of 2005, the City's Department of Licenses and Inspections (L & I) issued an order directing MAJ to cease operating a private sex club on the Property without a proper permit. MAJ filed an appeal with the Zoning Board of Adjustment of the City of Philadelphia (ZBA), arguing that MAJ has a proper permit, i.e., the 2000 Permit.

At the hearing before the ZBA, MAJ presented evidence showing that MAJ owns a restaurant that is open on Friday and Saturday nights, that no one under the age of twenty-one years is allowed to enter and that customers must show identifica-

performers to be paid. This provision is contained in the portion of the Zoning Code commonly know as an "Anti–Skid Row" ordinance that was widely adopted after the United States Supreme Court decisions in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), and *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), which imposed restrictions on certain types of uses because those uses impeded the economic development of the surrounding neighborhood. That definition of "cabaret" does not apply here because it only applies to the imposition of the restrictions on the use in § 14–1605, not whether the use should be allowed. *See* footnote 1. In any event, § 14–1605(7) provides that if any provision of § 14–1605 conflicts with any other provision of the zoning title, the more restrictive controls.

1. Section 14–1605 of the City's zoning code governs regulated uses, such as adult book stores, adult movie theaters and cabarets.

tion. Customers pay for a buffet dinner, which is served on the first floor. The second floor contains cubicles where customers may engage in consensual sexual activity or view others engaging in such activity. MAJ argued that the consensual, non-commercial, adult sexual activity is a proper accessory use to the restaurant, i.e., it is the accessory live entertainment and dancing allowed under the 2000 Permit, and that MAJ has a vested right in the 2000 Permit. The ZBA held otherwise, and the Court of Common Pleas of the First Judicial District (trial court) affirmed.

## I. Accessory Use

MAJ's 2000 Permit authorizes the following use: "Restaurant eat in only flrs (1–3) **with acc [i.e., accessory] live entertainment and dancing by patrons** not as defined in 14–1605...." (R.R. at 1) (emphasis added). Section 14–102 of the zoning code defines an accessory use as a use subordinate to and on the same lot as the main use and **customarily incidental** to the main use. The only accessory use question properly before this court is whether consensual, non-commercial, adult sexual activity is customarily incidental to a restaurant.[2]

"[A]n accessory use may exist even where there is no evidence that a majority, or even a substantial number, of similar properties are engaged in a similar accessory use." *Southco, Inc. v. Concord Township*, 552 Pa. 66, 75, 713 A.2d 607, 611 (1998).

Indeed, savvy entrepreneurs always hope to discover unique restaurant concepts that are not in the mainstream, but would attract a particular clientele. Thus, in our society, adults who enjoy the theater might be able to find a dinner theater in their area showing a Las Vegas-style Revue involving some audience participation. People who enjoy mysteries might be able to find a live murder mystery dinner show that involves audience participation. People who fantasize about being professional singers might be able to find a restaurant with karaoke that allows patrons to lip-sync and gyrate to recorded music. People who enjoy gambling might be able to find a restaurant that features off-track betting by patrons. Yet, no one would expect most restaurants to offer such entertainment for patrons.[3]

A specific entertainment activity constitutes an accessory use to a restaurant if it is "an entertainment activity akin to [or of the same general character as] other forms of entertainment provided in restaurants." *Id.* To be "akin to" or "of the same general character as," a specific entertainment activity need not be identical to other forms of entertainment provided in restaurants. Thus, in *Valley Forge Plaza Associates v. Upper Merion Township Zoning Hearing Board*, 141 Pa.Cmwlth. 686, 596 A.2d 1201 (1991), this court held that an

---

**2.** The majority discusses whether the consensual, non-commercial, adult sexual activity in this case is **subordinate** to the Property's use as a restaurant and concludes that the sexual activity "does not appear to be subordinate," (majority op. at 844), or it is "highly questionable whether the Property's use as a club was subordinate to its use as a restaurant." (Majority op. at 845.) However, neither the ZBA nor the trial court addressed this issue, and the City does not suggest the issue in its appellate brief as a basis for affirming on

other grounds. Moreover, the tentative nature of the majority's conclusion suggests that the discussion is mere *dicta*.

**3.** Similarly, restaurants targeting families with children might provide entertainment areas for children, e.g., the outdoor playground at McDonalds or the indoor playground at Chuck E. Cheese. Nevertheless, no one would expect **most** restaurants to have playgrounds for children or, as in this case, playgrounds for adults.

off-track betting parlor is akin to, or of the same general character as, an assembly hall because both are places where people gather for entertainment.

Here, there can be no question that engaging in or viewing consensual, non-commercial, adult sexual activity is a form of entertainment for some people.[4] It is akin to audience participation in a burlesque act at a dinner theater's Las Vegas-style Revue or audience participation in a murder mystery dinner show. The patrons "get into the act" and the act may have a sexual component. In karaoke restaurants, the patrons are the unpaid and exclusive providers of entertainment; in that sense, the entertainment at MAJ's place is of the same general character as that at a karaoke restaurant. As to the exclusively adult nature of the entertainment at MAJ's place, the entertainment is of the same general character as that at a restaurant with off-track betting.

Finally, our supreme court has stated that legislation may support a finding that a particular use is customarily incidental, and thus an accessory use, to a restaurant. *See Southco.* Here, in the City's own zoning ordinance, the City has contemplated restaurants with live entertainment that consists of paid entertainers performing sexual activities. *See* section 14–1605 of the zoning ordinance (defining a "cabaret").[5] Thus, I would conclude that, in the City, consensual, non-commercial, adult sexual activity may be provided as an accessory use to a restaurant.[6]

## II. Vested Right

The vested rights doctrine applies to situations where a municipality has erroneously issued a zoning, building or use permit. *Petrosky v. Žoning Hearing Board,* 485 Pa. 501, 402 A.2d 1385 (1979). In determining whether a party has acquired vested rights in a permit erroneously issued by a municipality, courts weigh five factors: (1) the party's due diligence in attempting to comply with the law; (2) the party's good faith throughout the proceedings; (3) the party's expenditure of substantial and unrecoverable funds; (4) the expiration without appeal of the period during which an appeal could have been taken from the issuance of the permit; and (5) the insufficiency of the evidence to prove that individual property rights or the public health, safety or welfare would be adversely affected by the use of the permit. *Id.*

With respect to the first factor, our supreme court has stated that a citizen exercises due diligence in attempting to comply

---

**4.** I note that, in his concurring opinion, Judge Pellegrini agrees that "engaging in sex in public with others watching ... would be considered entertainment under the regulatory scheme set forth in the Philadelphia Zoning Code." (Concurring op. at 848.)

**5.** The majority recognizes that, in *Southco,* "legislation created a custom whereby off-track wagering was associated with fine dining." (Majority op. at 845.) However, the majority then states, "Currently, we are aware of no such legislation associating semi-public sexual activity with haute cuisine." *Id.* However, it is clear that the definition of "cabaret" in the City's zoning code is legislation associating "semi-public sexual activity"

with restaurants. The majority's reluctance to acknowledge as much suggests that, even if there were a hundred lawful "cabarets" in the City, the majority would not recognize the live performance of sexual activities as an accessory use to a restaurant.

**6.** I note that the 2000 Permit does not allow MAJ to provide live entertainment that falls within any of the definitions in section 14–1605 of the zoning code, and MAJ's entertainment does **not** fall within the definition of "cabaret" because MAJ does not provide paid entertainers to perform sexual activities. In MAJ's restaurant, the patrons perform for no monetary compensation.

with the law by making inquiry of officials who should be expected to have knowledge of the law. *Id.* Here, MAJ exercised due diligence by applying for and obtaining from the proper authorities a permit to operate a restaurant with live entertainment and dancing. A year later, when MAJ became aware of limitations placed on the use of the Property, MAJ sought advice from L & I, the entity that issued the cease order here.[7] Section 14–1702 of the City's zoning code vests L & I with the duty and power to administer and enforce the zoning code, and, after MAJ's inquiry, L & I allowed MAJ to continue its operations despite the limitations.[8] Thus, the first factor weighs in favor of MAJ.

With respect to the second factor, MAJ has operated the restaurant in good faith since 2000. The City contends that MAJ knew that its use of the Property was illegal. However, the undisputed testimony is that L & I, which has the duty and power to enforce the zoning code, went into the restaurant and inspected the operations after a newspaper article was written about it in August 2001. "L & I was fully, 100 percent aware of all the activities that went on in this club." (R.R. at 57.) Yet, L & I allowed MAJ's operations to continue.[9] Thus, the second factor weighs in favor of MAJ.

With respect to the third factor, there is no dispute that MAJ has expended substantial and unrecoverable sums of money to adapt the Property for its present use. In fact, the City does not even address this factor in that portion of its brief discussing the vested rights argument. (*See* City's brief at 12–17.) Thus, the City appears to concede that the third factor weighs in favor of MAJ.

With respect to the fourth factor, the period during which an appeal could have been taken from the issuance of the 2000 Permit has expired, and no one filed an appeal during the appeal period. Thus, obviously, the fourth factor weighs in favor of MAJ.

Finally, with respect to the fifth factor, there is no evidence that the public health, safety or welfare would be adversely affected by MAJ's reliance on the 2000 Permit. In fact, MAJ presented a letter from thirty businesses stating that they have no problem with MAJ's use of the Property. (ZBA's Findings of Fact, No. 5; R.R. at 8–9.) The City argues that the restaurant threatens the public health, safety and welfare because the unprotected sexual activity on the Property increases the risk of spreading sexually transmitted diseases and AIDS. However, the ZBA did not find that there was unprotected sexual activity on the Property. To the contrary, the ZBA found that MAJ distributes condoms, (ZBA's Findings of Fact, No. 9), and this finding is supported by testimony stating, "We don't sell condoms. We give out con-

---

7. MAJ presented correspondence dated August 8, 2001, from MAJ to Claire Gaztner, a Zoning Administrator at L & I who appears to have signed the ZBA's decision in this case. (*See* Trial ct. op. at 5; R.R. at 71.)

8. Considering that MAJ contacted an official at L & I for advice regarding the limitations, I reject the City's argument that MAJ did not contact a zoning official charged with enforcing the zoning code. (*See* City's brief at 16.)

9. The majority notes that "mere delay" in enforcement of a zoning ordinance does not create a vested right. (Majority op. at 847 n. 9) (citing *Marzo v. Zoning Hearing Board of Abington Township*, 30 Pa.Cmwlth. 225, 373 A.2d 463 (1977)). Of course, this is correct. However, the fact that the City could have enforced its ordinance at a later date does not mean that MAJ did not rely in good faith on the City's failure to act for five years. Moreover, as indicated, there are other factors to consider in determining whether a property owner has a vested right.

doms." (R.R. at 19.) Thus, the fifth factor weighs in favor of MAJ.

Inasmuch as all five factors weigh in favor of MAJ, I conclude that MAJ has a vested right in the 2000 Permit.

### III. "Cabaret" Permit

The majority and concurring opinions suggest that MAJ needs a permit to operate a "cabaret" under section 14–102(24) of the zoning code. However, I submit that MAJ's 2000 Permit is, in effect, a permit for a "cabaret" under section 14–102(24) of the zoning code.

Initially, I presume that the City knows and intends that its zoning code contains two different definitions of "cabaret." Indeed, in construing the City's zoning code, we must give effect to all of its provisions. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a); *see Beers ex rel. P/O/A Beers v. Zoning Hearing Board*, 933 A.2d 1067 (Pa.Cmwlth. 2007) (noting the rules of statutory construction apply to the interpretation of zoning ordinances).

Section 14–102(24) defines a "cabaret," generally, to include a restaurant featuring "entertainers" [10] performing specified sexual activities. Section 14–1605 defines a "cabaret," in a special way for regulated uses, to include a restaurant featuring entertainers performing specified sexual activities **for monetary consideration.** In other words, the City has distinguished between "cabarets" with paid performers and "cabarets" without paid performers.[11]

MAJ's entertainers are **not** paid performers.[12] Thus, MAJ's restaurant fits within the definition of a "cabaret" in section 14–102(24), but not within the definition in section 14–1605. As indicated above, the 2000 Permit only prohibits live entertainment that falls within a definition in section 14–1605.[13] A section 14–102(24) "cabaret" without paid performers does not fall within a definition in section 14–1605. Thus, a section 14–102(24) "cabaret" without paid performers is not prohibited by the 2000 Permit, which makes the 2000 Permit, in effect, a permit for a "cabaret" without paid performers.

Accordingly, I would reverse.

---

**10.** Although one might think of a "cabaret" as a restaurant that provides live entertainment for its patrons to view, there is nothing in the general definition that prohibits the patrons of a restaurant from providing their own entertainment by engaging in sexual activities for others to view.

**11.** I note that the definition of "cabaret" in section 14–102(24) is a general provision, and the definition of "cabaret" in section 14–1605 is a special provision. When a general provision conflicts with a special provision, the two shall be construed, if possible, so that effect may be given to both. Section 1933 of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1933.

**12.** Indeed, there is no allegation or evidence that MAJ's patrons receive any compensation for engaging in sexual activities.

**13.** The two definitions of "cabaret" in the zoning code give the City some flexibility in its issuance of permits for "cabarets." If the City wanted to restrict further the live entertainment that MAJ could present at its restaurant, the City could have referenced section 14–102(24) instead of section 14–1605 in the 2000 Permit.